Filed 1/12/21  P. v. Varner CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>TERRANCE VARNER,<br><br>    Defendant and Appellant. | A160474<br><br>(Alameda County<br>Super. Ct. No. 150499A) |

Appellant Terrance Varner appeals from the summary denial of his petition for resentencing pursuant to Penal Code section 1170.95[1] and Senate Bill No. 1437, an appealable order.  (§ 1237.)

Appellant's court-appointed counsel has filed a brief raising no legal issues and asking this court to independently review the record pursuant to *People v. Wende* (1979) 25 Cal.3d 436.  Appellant has been advised by counsel that he has filed a *Wende* brief; that appellant may ask that he be relieved as counsel; and that within 30 days of the filing of the *Wende* brief, appellant may himself file a supplemental opening brief raising any issues he believes arguable.  Appellant has not filed such a brief.

---

[1] All statutory references are to the Penal Code unless otherwise indicated.

1

## FACTS AND PROCEEDINGS BELOW

Appellant was previously convicted by a jury of the second degree murder of Clarence Ogden (§§ 187, 189), with gun use and arming allegations, including that appellant and his codefendant, Jajuan Stroman, each discharged a firearm proximately causing death. Appellant was sentenced to an aggregate term of 40 years to life for the murder (§ 190), plus 25 years to life for the enhancement. On appeal, we affirmed appellant's convictions and sentence, and those of his codefendant, in an unpublished opinion entitled *People v. Stroman* (June 21, 2012, A127950 & A127996) (*Stroman*).

On April 22, 2020, appellant petitioned to recall his sentence and resentence him pursuant to section 1170.95 and Senate Bill No. 1437. In other words, appellant claims he was convicted of felony murder or murder under a natural and probable consequences theory, the complaint allowed the prosecution to proceed under a theory of felony murder or murder under the natural and probable consequences doctrine, and he was convicted of murder following a trial at which he could be convicted for first or second degree murder, and he could not be convicted of either of those offenses after January 1, 2019, due to the enactment of Senate Bill No. 1437.

Appellant's petition alleges he could not be convicted of first or second degree murder because of changes to sections 188 and 189, effective January 1, 2019; that he "was convicted of second degree murder pursuant to an aider and abettor [theory] and the seriously flawed and prejudicial jury instructions; [¶] I am not the actual killer; [¶] . . . [¶] I did not act as a major participant in the felony with reckless indifference to human life; [¶] . . . [¶] [and a] complaint was filed against me that allowed the prosecution to proceed under . . . an aider and abettor and a seriously flawed and prejudicial

2

set of jury instructions." The petition also alleged appellant "with some ill-defined mental state, aided and abetted Mr. Stroman, who killed Mr. Ogden with implied malice."

On May 4, 2020, Alameda County Superior Court Judge Morris Jacobson denied appellant's petition to recall his sentence and resentence him. Because the court determined appellant failed to make a prima facie showing of entitlement to relief, it declined to appoint counsel for appellant or schedule a hearing at which appellant could present evidence.

In his order denying appellant's petition, the court quoted at length from portions of out our opinion in *Stroman,* describing the events that led to the murder of Ogden. In our general overview of the facts we summed them up this way: "The killing occurred on the evening of March 28, 2004, and most people in the drama had street names. Defendants did not testify. There were variations in the eyewitness accounts, some evidently due to fear or loyalty, but the overall picture is that 18-year-old Ogden ('Little C') verbally accosted Stroman ('Wookie') at an Oakland street gathering by stepping into a tiff between Stroman and his former girlfriend Seneca Casteele ('Slim'). Stroman left in his burgundy Oldsmobile, picked up Varner ('T'), who had a gun for each of them, returned with Varner [and another person[2]] in the car, and caught up with Ogden as he ran from a car in which he rode with Casteele and her friends. In front of dozens of people, defendants then got out, confronted Ogden and, as he fled . . . each shot him once in the back, killing him." (*Stroman, supra*, A127950 & A127996.)

The trial court also quoted extensively from portions of our opinion, describing the testimony at trial or at the preliminary hearing or statements

---

[2] The third person was a juvenile who was not a party to this criminal proceeding.

to the police of eyewitnesses—some of whom were deemed unavailable by the court at the time of trial or had invoked their right to silence—who saw Stroman and Varner each shoot Ogden in the back as he was trying to escape from them, or otherwise implicated the two in the homicide. Two examples should suffice.

DeAngelo Hudson stated that he "saw Ogden, seemingly drunk and holding a two-liter soda bottle, walk up to the driver side of Stroman's car" and tell Stroman to stop: "mess[ing]" with his former girlfriend Casteele and her friends, causing Stroman to shift his attention from Casteele to Ogden's attempt to interfere in his argument with her. Later, after Stroman briefly left the scene and returned with Varner and another person, Hudson described the resumption of the altercation between Stroman and Ogden and the denouement. He saw Ogden "backed against a parked gray car, with both defendants 'up on him.' Ogden had his hands to his side at hip level, and Hudson saw nothing in them. Ogden was moving his shoulders, as if trying to get away from the car. When Ogden broke free by pushing between defendants and starting to run, Stroman yelled ' "get him," ' and Varner shot Ogden in the back at arm's length. Then Stroman fired a second shot, hitting Ogden in the shoulder (where Hudson saw a blood spot on his white T-shirt)." (*Stroman, supra*, A127950 & A127996.)[3]

---

[3] After Hudson invoked the Fifth Amendment at trial, his preliminary hearing testimony was read to the jury pursuant to Evidence Code section 1291, subdivision (a)(2). That testimony included over 100 pages of cross-examination by counsel for Varner and lesser follow-up examination by trial counsel for Stroman. The confrontation right violation raised by the defense under *Crawford v. Washington* (2004) 541 U.S. 36, as well as statutory arguments against the unavailability finding and prior testimony ruling, were denied by the trial court and we sustained those rulings. (*Stroman, supra*, A127950 & A127996.)

Another eyewitness, Carl Anthony, gave police a taped statement that closely tracked Hudson's account. As stated in our opinion, when Stroman returned to the scene with Varner, they "got out of their car and confronted [Ogden], running up and putting a gun in his face, pushing him up against a car, and saying 'I'll smoke your bitch ass.' Stroman had a chrome gun and Varner a black one—each described by Anthony as a 'revolver.' Defendants were then briefly distracted as 'some OG dude' Anthony did not know tried to stop them. He came into the street and tried to calm things down, urging, ' "Y'all can't do this. Don't do this on my spot" '; and ' "Man, y'all gotta quit all that bullshit! Don't do this on my spot." ' 'Ogden used the diversion to spin[] off' and make a run for it, but as he did, Stroman yelled ' "Hit him!" ' Anthony heard 'BAM!' as Varner fired first, dropping his cell phone and sweatshirt, and then Stroman fired, each hitting Ogden in the back. Ogden did not have a weapon. Anthony and a crowd of people headed off down the hill to 23rd Avenue, where Ogden had run, and found him lying on the ground."[4]

## DISCUSSION

As our opinion in *Stroman* demonstrates, the verdict of second degree murder was supported not only by the testimony and statements of Hudson and Anthony, but as well by the testimony of other eyewitnesses and

---

[4] Anthony's statement to the police was read into the record after extensive questioning at trial, during which he claimed he had no memory of the statement or of the participants and events of that night, beyond seeing his friend dead. (*Stroman, supra*, A127950 & A127996.) The trial court found Anthony's lack of memory was evasive, untruthful, and inconsistent with his prior statements and the latter were therefore admissible under Penal Code section 1235 and Evidence Code section 770. We sustained those rulings, citing *People v. Johnson* (1992) 3 Cal.4th 1183, 1219–1220). (*Stroman, supra*, A127950 & A127996.)

5

evidence that contradicts appellant's contention he was not the "actual killer" of Ogden.

Appellant's claim that he "was convicted of second degree murder pursuant to an aider and abettor [theory] and the seriously flawed and prejudicial jury instructions," and that the complaint "allowed the prosecution to proceed under an aider and abettor [theory] and a seriously flawed and prejudicial set of jury instructions" is puzzling.

To be eligible for resentencing under section 1170.95, a petitioner must be "[a] person convicted of felony murder or murder under a natural and probable consequences theory" and show that the complaint filed against him "allowed the prosecution to proceed under a theory of felony murder or murder under the natural and probable consequences doctrine."  (§ 1170.95, subd. (a)(1).)

At the time of appellant's trial, it was possible for a person to be convicted of second degree murder as an aider and abettor under a theory of felony murder or under the natural and probable consequences doctrine. Former CALCRIM No. 541C instructed the jury, among other things, that a defendant charged with murder "under a theory of felony murder may be guilty of second degree murder under this theory provided the People have proven he or she committed or attempted to commit, or aided and abetted, or was a member of a conspiracy to commit an inherently dangerous felony or felonies, and intended to commit or intended to aid and abet the perpetrator in committing or one or more of the members of the conspiracy to commit an inherently dangerous felony."  The instruction went on to explain that "[a]n act causes death if the death is the direct, natural, and probable consequence of the act and the death would not have happened without the act.  A *natural and probable consequence* is one that a reasonable person would know is

6

likely to happen if nothing unusual intervenes. In deciding whether a consequence is natural and probable, consider all the circumstances established by the evidence." (See also, CALJIC No. 8.33, which is to the same effect.)

However, appellant was neither charged with murder nor convicted of second degree murder, *under a theory of felony murder or the natural and probable consequences doctrine.* As Judge Jacobson pointed out in his order, "A review of the instructions reveals an absence of any instructions concerning felony murder, and the jury was 'instructed on aiding and abetting *without* the [natural and probable consequences (NPC)] doctrine.'" (Citing *Stroman, supra*, A127950 & A127996.) Petitioner argued on direct appeal that "the instructions on aiding and abetting and second degree (implied malice) murder together misdirected the jury that it could find him guilty of aiding and abetting implied-malice murder where the NPC doctrine was not used—a 'legal impossibility' in his view." As Judge Jacobson noted, we rejected this claim for lack of prejudice.

Addressing appellant's contentions that (1) testimonial variation about how many shots were fired and whether he himself fired at Ogden, allowed the jury to decide that he did not directly perpetrate the murder but, rather, aided and abetted Stroman by procuring the guns and giving Stroman the one he used, and (2) the jury improperly found him guilty without assessing his own intent as an aider and abettor, Judge Jacobson rejected both. The problem with these hypotheses, he said was "that the jury, beyond finding him guilty, also found true enhancements that, during the crime, he personally and intentionally discharged a firearm (§ 12022.53, subd. (c)) and did so proximately causing Ogden's death (§ 12022.53, subd. (d)). On the evidence, the jury cannot have relied on aiding and abetting to return those

enhancement findings and thus no error in the aiding and abetting instructions could have effected the verdict." (Citing *Stroman, supra*, A127950 & A127996.)

Finally, Judge Jacobson also dismissed appellant's argument that the jury did not necessarily determine that he shot Ogden, but could have believed he intentionally fired a gun and missed but set in motion the events that led to Stroman's death, or perhaps there was a third shooter, who actually shot and killed Ogden. Quoting language from our opinion, Judge Jacobson pointed out that the jury had no reason to think appellant could have "proximately" caused Ogden's death by merely setting in motion events that resulted in Ogden's death as a direct, natural, and probable consequence. As we said, "There is no reason to think, on the evidence and presentation in this case, that the jury understood that section 12022.53, [subdivision] (d) could require anything less than personal infliction of the harm. The possibility was never suggested in jury arguments, and the jury never asked questions about it." (*Stroman, supra*, A127950 & A127996.)

We could not quarrel with Judge Jacobson's ruling without questioning the veracity of our own opinion, which we do not.

Nor was it improper for Judge Jacobson to look beyond the face of appellant's petition to our opinion in *Stroman* and the instructions given the jury in that case. The language of section 1170.95 "makes plain the Legislature's intent to permit the sentencing court, before counsel must be appointed, to examine readily available portions of the record of conviction to determine whether a prima facie showing has been made that the petitioner falls within the provisions of section 1170.95—that is, a prima facie showing the petitioner may be eligible for relief because he or she could not be convicted of first or second degree murder following the changes made by Senate Bill No. 1437 to the definition of murder in sections 188 and 189."

8

(*People v. Verdugo* (2020) 44 Cal.App.5th 320, 323, review granted Mar. 18, 2020, S260493; accord, *People v. Cornelius* (2020) 44 Cal.App.5th 54, review granted Mar. 18, 2020, S260410; *People v. Lewis* (2020) 43 Cal.App.5th 1128, review granted Mar. 18, 2020, S260598; compare *People v. Cooper* (2020) 54 Cal.App.5th 106, 112, review granted Nov. 10, 2020, S264684.)[5]

## DISPOSITION

Having viewed the entire record we find no legal issues that warrant further briefing.  Accordingly, the order summarily denying the section 1170.95 petition is affirmed.

---

[5] This issue is currently pending before our Supreme Court in *People v. Lewis*, *supra,* 43 Cal.App.5th 1128, review granted March 18, 2020, S260598.

_____
Kline, P.J.

We concur:


_____
Richman, J.


_____
Miller, J.


*People v. Varner* (A160474)

10